Pat GLOVER, *et al. v.* Dean OVERSTREET, *et al.*

98-16                                   984 S.W.2d 406

Supreme Court of Arkansas
Opinion delivered January 7, 1999

*Pike & Bliss*, by: *George E. Pike Jr.* and *Deborah Pike Bliss*, for appellants.

*Allen Law Firm*, by: *H. William Allen*, for appellees.

Tom Glaze, Justice. This case involves the Overbrook Property Owners' Association (OPOA), a nonprofit corporation located in North Little Rock. A segment of OPOA's membership led by Thomas Ahart and hereafter referred to as "Ahart" or the "Ahart members," attempted unsuccessfully to oust the Association's entire board of directors at an annual meeting. The Association was organized and incorporated under the Arkansas Nonprofit Corporation Act, Ark. Code Ann. §§ 4-28-201-224 (Repl. 1996). An interpretation of that Act and the Association's articles of incorporation and bylaws are at issue in this appeal. The court of appeals certified this case to us as involving an issue of first impression, but we also accept reassignment of this appeal because it involves a legal principle of major importance. Ark. Sup. Ct. R. 1-2(b)(1) and (d).

This dispute grew, in part, out of hard feelings between members of the OPOA when the land developer, Metropolitan Trust Company, and the Association's board of directors voted in favor of constructing a neighborhood swimming pool and assessing Association members $250.00 each to underwrite construction costs. There were 176 Association members who voted against the project and only 88 members who voted in favor of it. However, the developer had 2,342 votes that it cast in support of building the pool. This action took place early in 1997 when Metropolitan Trust was entitled to a class B membership and 2,342 votes under the OPOA's articles of incorporation. That class B membership expired on June 1, 1997, only nine days before OPOA's annual meeting to be held on June 10, 1997.

The Ahart members, who still harbored ill feelings towards the developer and Association's board of directors, decided they would move to oust the board members. Under the Association's articles and bylaws, the board was comprised of nine members who served staggered terms; three of the directors' terms were to expire and to be filled at the June 10 annual meeting. The Association's members were notified by a circular in May and by a June 4 letter that only "official proxies" would be utilized at the June 10 meeting, and those proxies limited members to vote only for the three board-member positions whose terms were to expire. Because the Ahart members wanted to remove and replace all or a majority of the directors, they printed their own proxy forms that would allow them to vote on all issues and elections. Ahart's group was able to obtain 404 proxies.

The Ahart members appeared at the June 10 meeting with a court reporter who recorded what took place. Mr. Dean Overstreet took official charge of the Association meeting for the purpose of receiving nominations for the three board-member positions whose terms were expiring, but Ahart attempted several times to make a motion that would oust the entire board and elect five new members. Overstreet explained that the first order of business was to fill the three director slots that had expired, and he would accept nominations in addition to the candidates offered by the board. Ahart members opted not to nominate anyone for the three vacated positions, and over the Ahart members' objection, Overstreet took a final vote for each of the three positions. The votes cast in favor of the three candidates for the open positions totaled as high as 171.

Mr. Overstreet then recognized the Ahart members who moved (1) to withdraw all powers, duties, and authority from the present board of directors, (2) to amend the bylaws of the Association, (3) to remove all present board members from office, and (4) to elect new board members.[1] After the Ahart members' motions were seconded, Overstreet tabled them, and explained that the

---

[1] At this point, Ahart members were offering four, not five, of its members for nomination, because one of their designated five was not a property owner as required by the articles of incorporation.

Ahart motions would have to be presented and voted on at a special meeting so all members would be apprised of the motions. Ahart members made no attempt at this time to override Overstreet's action, but they did object to the tabling of their motions. Shortly thereafter, Overstreet received a motion and a second to adjourn the meeting; the meeting ended at 8:30 p.m. At 8:42 p.m., the Ahart members called their own meeting to order, and Mr. Ahart asked for a ballot box. Ahart then proceeded to take a vote on the following two questions from those members who had stayed:

(1) AHART: "On the motion that I made of removing the existing board of directors, all those in favor." A chorus of voices said, "Aye."

(2) AHART: "Need to vote on the second motion amending the bylaws of OPOA to provide instead of the present Article IV, Section 3, that a vacancy may be created on the board of directors, by a director's removal from office by a vote of the members. All of those in favor, say aye."

A chorus of voices said, "Aye." Ahart then announced, "Motion carried." Apparently 68 Ahart members cast their own votes, and Mr. Ahart cast 336 votes by proxy. The meeting was adjourned at 8:45 p.m.

On June 17, 1997, the Ahart members filed suit in chancery court against defendants Dean Overstreet and OPOA's nine board members. Ahart members sought an injunction against Overstreet and the board from (1) taking any action to amend the Association's articles or bylaws, (2) preventing them from calling any special meeting, and (3) prohibiting them from changing the Association's status until the chancery court rendered a final decision. Ahart members further asked the court to rescind board actions taken since the June 10 meeting, to declare Ahart nominee members to be new directors, to order all Association records to be delivered to the new board members, and to assess all costs of litigation to the defendants. After a trial was held on October 8, 1997, the chancellor dismissed the Ahart members' complaint with prejudice. She found that, under the Association's articles and bylaws, Ahart members first had to move and vote for the

transfer of the board's powers to the membership before the membership could remove the present directors and elect replacements. The chancellor held the evidence failed to show that the Ahart members complied with Association articles and bylaws in this respect, and for this sole reason rejected the Ahart members' case.

On appeal, Ahart members spend much of their time arguing the Association's board members (1) improperly rejected Ahart's proxies, (2) illegally tabled Ahart's motion to oust incumbent board members, and (3) illegally postponed voting on Ahart's motions until a special meeting could be held. Overstreet and the incumbent board members respond primarily by arguing that even if the Ahart members are correct in their arguments, they simply failed to proceed in accordance with Association articles and bylaws in their efforts to remove and replace the entire board of directors. This was the chancellor's holding, and we are compelled to agree.

Ahart members are correct that voting by proxy is established for nonprofit organizations under Ark. Code Ann. § 4-28-212 (Repl. 1996). In this respect, § 4-28-212(c)(1) provides that a member may appoint a proxy to vote or otherwise act for him by signing an appointment form, and provides that the proxy is effective when received by the secretary or other officer or agent authorized to tabulate votes. While a member's proxy may be expressly limited on the face of the appointment form, *see* § 4-28-212(c)(4), the statutory law does not provide that an association's board can arbitrarily impose such limitations on a member's proxy. *See also* Ark. Code Ann. § 4-28-224 (Repl. 1996) (other provisions bearing on voting by proxy). *But see* Howard L. Oleck, *Parliamentary Law and Practice for Nonprofit Organizations* § 58 (2d ed. 1991) (a proxy can be either "limited" or "general," and a general proxy allows its holder to vote on any ordinary business that comes before the assembly, but grants no authority to vote on extraordinary matters).[2]

---

[2] Since we assume the validity of the Ahart members' proxies in reaching our decision, we need not address whether ouster of the entire board was an extraordinary matter for which a proxy could be cast.

Also, if we were required to reach the issue, we would likely hold that Ahart members are correct that Overstreet, in presiding over the June 10 meeting, was in error when he tabled Ahart's motions, which were intended to transfer board powers to the members and to remove incumbents and elect new board members. The Association's articles or bylaws do not adopt Roberts' Rules of Order, but under those rules, which were referred to by both the Ahart members and appellees, the "assembly" may temporarily lay aside a question when something else of immediate urgency has arisen. *See* Roberts' Rules of Order Newly Revised § 17 (7th ed. 1970). While there is no set time under those Rules for taking the matter up again, the matter can be resumed at the will of a majority. *Id. See also* Howard L. Oleck, Parliamentary Law and Practice for Nonprofit Organizations § 22 (2d ed. 1991).

In the present case, Ahart members did not call for a vote to overturn Overstreet's ruling during the first meeting, although Ahart members did object to tabling their motions. Nor did they attempt to acquire board power at their own meeting so they could remove and replace OPOA's incumbent board members by casting their votes in present or by proxies. Thus, even if we agreed their proxies were valid and their earlier motions had been illegally rejected by Overstreet, the Ahart group's argument fails because Ahart ultimately did not comply with the terms of the Association's articles or bylaws, which required them first to transfer board powers to the members before taking action to remove the incumbent directors.

OPOA's articles and bylaws establish the board of directors, its terms, and provide that the board shall manage the affairs of the Association and exercise the powers, duties, and authority vested in the Association subject to the members voting to transfer those powers to the superior right of the members. This transfer of powers was required of the Ahart members, because the incumbent directors' terms are staggered. Accordingly, only up to three new directors can be voted on at an annual meeting unless the members change the OPOA's bylaws. In short, the Association has no existing bylaw that would permit removal of more than three directors, much less the ouster of the

entire board. Professor Oleck in his treatise discusses the removal of directors as follows:

> Directors may be removed from office, for good cause, by a majority vote of the board of directors or the members. What constitutes "good cause" depends on the nature and circumstances of the organization, but it is not simply a desire by the majority to be rid of an opposing faction. Directors should be removed pursuant to procedural provisions contained in the bylaws or charter.
>
> * * *
>
> If a director is removed illegally, any election of his replacement is also illegal. Although it is the general policy of some state courts to avoid interfering in the internal affairs of nonprofit organizations, the removal of a director who has been illegally elected may be subjected to court review. *Id.* at § 82.

Although Arkansas's Nonprofit Corporation Act of 1993 is inapplicable to OPOA because OPOA was incorporated under Act 176 of 1963, as amended, the 1993 Act [compiled at Ark. Code Ann. §§ 4-33-101-1701 (Repl. 1996)] is at least worth mentioning. While the 1963 Nonprofit Corporation Act does not address the removal of directors, the 1993 Act does. Section 4-33-808 of the 1993 Act provides members may remove directors without cause but only at a meeting called for that purpose.

█ In the instant case, because no statutory law, articles, or bylaws specifically address the removal of directors, Ahart members were required by Association articles and bylaws to first withdraw or suspend the directors' powers and transfer them to the members before the Ahart members could rescind the existing board's actions taken at the Association's annual meeting. They simply failed to do so. As discussed in detail above, Ahart articulated his members' motion to transfer board powers to the members in the initial meeting presided by Overstreet, but when Ahart members formally resumed the meeting, after Overstreet's faction left, Ahart never mentioned the transfer-of-power motion, nor was a vote taken on that question. We also note that the two motions made by Ahart were not seconded before Ahart called for a vote, and voters were not given the opportunity to vote "no" on the questions.

The Ahart members actually agree that they were first required to transfer the board powers to the members, but they submit that, during their "resumed meeting," it was only necessary to make abbreviated references to the motions previously made earlier when Overstreet was presiding. We cannot agree. In fact, what the Ahart members refer to as abbreviated references are not abbreviated at all. As already discussed, Ahart entirely omitted any mention of a motion to transfer board powers to the members. As a consequence, they took no vote on that critical and requisite issue.

■■ In conclusion, we believe the stated general policy of the courts to avoid intermeddling in corporate governance and operation is a sound one. *See Baker v. Henry Glass & Co.*, 140 Misc. 2d 836, 531 N.Y.S. 2d 746 (1998); *see also* 19 C.J.S. *Corporations* § 581 (1990). That policy is valid, at least, in situations like the one present here. Here, OPOA had no parliamentary or formal rules in place for conducting its meetings, and while the incumbent board or officers may arguably be said to have erred in limiting members' proxies or tabling Ahart's motions, the Ahart members still had every opportunity to overrule and vitiate such actions. Nonetheless, the Ahart members, as discussed above, made their own critical errors when they attempted to remove and replace the incumbent members. Perhaps our decision would be different if the incumbent directors or officers had acted in fraud, bad faith, or gross mismanagement. *Id.* The chancellor made no such finding, nor do the Ahart members argue for it. Again, the most that can be said in behalf of the Ahart members is that the incumbent board or officers illegally erred when ruling on the Ahart proxies and motions, but even assuming these rulings were erroneous, the Ahart members were not prejudiced, since they had the opportunity, but failed to remedy those errors.

For the reasons above, we affirm.

SMITH, J., not participating.